UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REBECCA RAUSCH,<br><br>    Plaintiff,<br><br>v.<br><br>FLATOUT, INC.,<br><br>    Defendant. | Case No. 22-cv-04157-VC<br><br>**ORDER RE MOTION TO DISMISS**<br>Re: Dkt. No. 20 |

When a manufacturer advertises the amount of protein in a product on its package, the Food and Drug Administration requires the manufacturer to include additional information on that product's nutrition facts panel: the manufacturer must provide the "percent daily value" for protein based not on the raw amount of protein in the product, but on the amount of protein that the human body will actually absorb. The question presented in this case is whether a manufacturer's failure to include that percent daily value renders its other statements about protein quantity misleading—both within the meaning of the FDA's regulations and state law. The answer is yes.

**I**

**A**

This section relies on the facts as pleaded in the complaint. At the motion to dismiss stage, a court accepts all well-pleaded facts as true. *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 782 (9th Cir. 2008).

Protein is essential for a healthy diet, and consumers often pick products based on their protein content. But not all protein is created equal: protein quality matters just as much as

quantity. When you consume protein, your body breaks it down into its constituent parts—known as amino acids—and then uses those amino acids to make other proteins necessary for the body to function. To complete that process, the body must have access to nine different amino acids. If one amino acid is lacking, protein synthesis won't occur. High-quality proteins contain all nine amino acids in the right proportions for protein synthesis. A protein might additionally be lacking because it's not fully digestible. For instance, according to the complaint in this case, most plant proteins are only 85% digestible, so 15% of the protein from a plant source will just pass through your body.

The Food and Drug Administration (FDA) requires all products to include the grams of protein in a serving on the product's nutrition facts panel (the black-and-white box often found on the back or side of a product's label). 21 C.F.R. § 101.9(c)(7). The amount of protein per serving does not need to be adjusted for the protein's amino acid content or digestibility. (For the sake of simplicity, this ruling refers to these concepts together as part of the protein's "quality.")

But if a product makes a "protein claim" anywhere else on its label—for instance, "Excellent source of protein!" or even just "20g of protein"—the FDA requires the manufacturer to include additional information on the nutrition facts panel: The manufacturer can still list the grams of protein unadjusted for the protein's quality, but they must also include the "corrected amount of protein per serving," expressed as a percent of daily value. § 101.9(c)(7)(i). The corrected amount of protein is the quantity of protein multiplied by the "amino acid score," a discount factor that accounts for the protein's amino acid content and digestibility. § 101.9(c)(7)(ii). That "corrected amount" is then divided by 50g (the amount of protein that the FDA estimates adults should eat every day) to give you the percent daily value. § 101.9(c)(7)(iii).

To make things more concrete, imagine a whey protein bar and an oat protein bar. Imagine that whey is a higher-quality protein that's almost fully absorbable; oat is not. Both the whey and oat protein bars could list 20g of protein on their nutrition facts panel. But if both protein bars say, "20g protein!" on the front of their labels, they must include the quality-

2

adjusted percent on their nutrition facts panels. If we assume that 100% of the whey protein can be absorbed by the human body, the "corrected amount of protein per serving" for the whey protein bar would be 20g. That number, expressed as a percent of daily value, would be 40%. The oat protein bar wouldn't fare so well. If we assume that the human body can only absorb 50% of the oat protein, the "corrected amount of protein per serving" for the oat protein bar would be 10g. And ten grams expressed as a percent of daily value is 20%.

**B**

Flatout, Inc. sells a variety of products, including flatbreads and pizza crusts. According to the complaint, several of these products advertise their protein content on the front of their labels, but they fail to include the quality-adjusted percent on their nutrition facts panels. For instance, according to the complaint, Flatout's Light Original Flatbread says "Fuel Your Day…60 calories…5g net carbs…6g protein" on both the front and back of its package. But the nutrition facts panel says only 6g of protein—it doesn't include the percent daily value, adjusted for the protein's quality. According to the complaint, the primary source of protein in Flatout's products is wheat protein, and wheat protein has an amino acid score of between .4 to .5. So, the quality-adjusted percent would show that a consumer would only absorb about half of the protein in Flatout's Flatbread.

Based on these allegations, Rebecca Rausch brings a variety of state law claims under three distinct theories. The first two theories relate to her claim that the labels are "unlawful" under California's Unfair Competition Law. "The UCL creates a cause of action for business practices that are (1) unlawful, (2) unfair, or (3) fraudulent." *Hadley v. Kellogg Sales Co.*, 243 F. Supp. 3d 1074, 1089 (N.D. Cal. 2017) (citing Cal. Bus. & Prof. Code § 17200). "Each 'prong' of the UCL provides a separate and distinct theory of liability." *Id.* The "unlawful" prong "borrows violations of other laws" and makes them "independently actionable." *Alvarez v. Chevron Corp.*, 656 F.3d 925, 933 n.8 (9th Cir. 2011). Rausch alleges that Flatout's labels violate certain FDA regulations and that, in turn, violates California's Sherman Law, which incorporates the FDA's labeling regulations. *Hadley*, 243 F. Supp. 3d at 1095. (Rausch, like any other private plaintiff,

could not sue to enforce the FDA's regulations directly. *See Perez v. Nidek Co*., 711 F.3d 1109, 1119 (9th Cir. 2013)).

To support her claim based on the "unlawful" prong of the UCL, Rausch alleges that Flatout's labels violate the FDA's regulations in two different ways. First, she alleges that Flatout's labels—both the protein statements on the package and the product's nutrition facts panels—violate the FDA's requirement that Flatout include the quality-adjusted figure. Second, she alleges that Flatout's labels violate a more general FDA regulation that prohibits misleading "nutrient content claims."

Rausch's third theory forms the basis for her other claims, those brought under the fraudulent prong of the UCL, California's False Advertising Law, the Consumer Legal Remedies Act, as well as her claims for fraud, deceit, misrepresentation, and unjust enrichment.[1] This last category of claims depends on the same idea: that the labels would deceive a reasonable consumer. *Hadley*, 243 F. Supp. 3d at 1089.[2]

## II

To understand Rausch's first two theories—both alleging that Flatout's labels violate various FDA regulations—it's helpful to have some background on the statute authorizing those regulations. The Federal Food, Drug, and Cosmetic Act, enacted in 1938, prohibits the misbranding of food. *See Chacanaca v. Quaker Oats Co*., 752 F. Supp. 2d 1111, 1116 (N.D. Cal. 2010). "In 1990, Congress amended the FDCA through the passage of the Nutrition Labeling and Education Act." *Id.* The Nutrition Labeling and Education Act made nutrition labeling mandatory on all foods. *See* 21 U.S.C. § 343(q).

---

[1] These alleged violations of the FAL and CLRA also support Rausch's claim under the unlawful prong of the UCL. *See* Compl. ¶ 104. Rausch does not bring a claim under the "unfair" prong of the UCL. *See* Dkt. No. 24 at 17.

[2] As a fourth theory, Rausch alleges that the protein statements are misleading because of the methodology Flatout uses to calculate the amount of protein in its products. She acknowledges that these methodology claims are foreclosed by this Court's decision in *Nacarino v. Kashi*, 584 F. Supp. 3d 806 (N.D. Cal. 2022), discussed at length later in this ruling, and she brings the methodology claims only to preserve them in case the Ninth Circuit reverses *Nacarino*. As Rausch anticipated, the methodology claims are dismissed for the reasons explained in *Nacarino*.

Today, "the many subsections of 21 U.S.C. § 343 establish the conditions under which food is considered 'misbranded.'" *Chacanaca*, 752 F. Supp. 2d at 1116. First, there's a broad provision: a food is misbranded if its labeling is "false or misleading in any particular." § 343(a). Then, there are more specific provisions. Section 343(q) regulates the nutrition information that all manufacturers *must* include on their labels. For instance, under that subsection and its implementing regulations, all manufacturers must include a nutrition facts panel that discloses the number of calories and the amount of fat, carbohydrates, and protein in the food. 21 U.S.C. § 343(q)(1)(C)–(D); 21 C.F.R. § 101.9(c). Section 343(r), in turn, regulates the voluntary statements a manufacturer can make about a food's nutrient content outside of the nutrition facts panel. As relevant here, this subsection regulates statements that "characterize" the level of a nutrient in a food. § 343(r)(1)(A). That includes statements like, "20g protein!" The FDA refers to these statements as "nutrient content claims," and it regulates them extensively. 21 C.F.R. § 101.13(b). The remainder of section 343 covers other specific scenarios: for instance, it provides that a food is misbranded if it is an imitation of another food, and its label doesn't say "imitation." 21 U.S.C. § 343(b).

## A

Rausch's first theory—that Flatout's packaging violates specific FDA regulations for protein claims—is straightforward enough. First, based on the allegations in the complaint, the nutrition facts panels are unlawful: under section 101.9(c)(7)(i) of the FDA's regulations, if a manufacturer makes a "protein claim," it must include the quality-adjusted figure, expressed as a percent daily value, on the product's nutrition facts panel. 21 C.F.R. § 101.9(c)(7)(i); *Roffman v. Perfect Bar*, *LLC*, No. 22-CV-02479-JSC, 2022 WL 4021714, at *3 (N.D. Cal. Sept. 2, 2022). According to the complaint, Flatout fails to do so.

Second, according to the complaint, the protein statements elsewhere on Flatout's labels are also unlawful: under section 101.13(n). a manufacturer may only make a "nutrient content claim"—a statement characterizing the level of a nutrient in the product outside of the nutrition facts panel—if they provide a nutrition facts panel that complies with section 101.9. § 101.13(n);

*see also Roffman*, 2022 WL 4021714, at *3–5. Flatout's nutrition facts panels are out of compliance with section 101.9, so its nutrient content claims (the statements about the products' protein content) are also unlawful.[3]

**B**

The second theory underlying Rausch's "unlawful" UCL claim—that the labels are "misleading" within the meaning of the FDA's regulations—requires a bit more thought. As relevant here, the FDA's regulations provide that a label may only contain an explicit statement about the "amount…of a nutrient" outside of the nutrition facts panel if the statement "is not false or misleading in any respect." 21 C.F.R. § 101.13(i)(3). (That echoes the general provision of the Food, Drug, and Cosmetic Act, which provides that a food is misbranded if its labeling is "false or misleading in any particular." 21 U.S.C. § 343(a).)

This Court addressed a similar theory in *Nacarino v. Kashi*. 584 F. Supp. 3d 806 (N.D. Cal. 2022). There, like here, the label on Kashi's cereal stated that the cereal had "11g" of protein, but that figure was not adjusted for the protein's quality. *Id.* at 809. But that case was different in one crucial respect: there were no allegations that Kashi failed to include the quality-adjusted percent on the cereal's nutrition facts panel. Indeed, according to Kashi's request for judicial notice, Kashi had disclosed the quality-adjusted percent. *See* Exhibit 1, Request for Judicial Notice at 3, *Nacarino v. Kashi*, 584 F. Supp. 3d 806 (N.D. Cal. 2022) (No. 21-7036), Dkt. No. 22-1. So the only question in that case was whether making a statement about protein quantity on the front of the package—without including a disclaimer about protein quality *also on the front of the package*—violated the FDA's prohibition on misleading statements in and of itself.

The Court held that it did not. After all, the regulations allow manufacturers to include the amount of protein—unadjusted for the protein's quality—on the nutrition facts panel.

---

[3] Flatout appears to concede that its labels are unlawful under these regulations, but it argues that Rausch's claims are nonetheless impliedly preempted. For the reasons explained by Judge Orrick in *Brown v. Van's International Foods, Inc.*, the claims are not impliedly preempted. No. 22-CV-00001-WHO, 2022 WL 1471454, at *6–8 (N.D. Cal. May 10, 2022).

6

*Nacarino*, 584 F. Supp. at 810. "Against the backdrop of this protein-specific provision, the general language of section 101.13 cannot be interpreted as proclaiming that it is 'false or misleading' to use the same statement—'11g Protein'—on the front of the box as is authorized in the Nutrition Facts label." *Id.*

If that's all *Nacarino* had said, then it would be easily distinguishable because Kashi's labels complied with the FDA's other requirements for protein statements. But *Nacarino* went a step farther. The Court acknowledged that the FDA did not treat protein statements made in the nutrition facts panel the same way it treated protein statements made elsewhere on a label. *Id.* But, the Court said, requiring a manufacturer who advertises a product's protein content elsewhere on the label to include the quality-adjusted percent in the nutrition facts panel does "not mean that statements of protein quantity would be misleading without this additional context." *Id.* The Court continued:

> To hold otherwise would be to find that an FDA-approved protein measurement technique is inherently misleading. This is not a plausible interpretation of the regulations. A better reading is that the FDA recognizes that in situations where consumers are drawn to a product for its protein content—those situations in which a manufacturer is touting its product's protein on its packaging—consumers deserve additional information in the Nutrition Facts label. This is not to remedy an otherwise misleading figure, but to supply protein-conscious consumers with information that gives them further assistance in deciding what to buy.

*Id.* To be clear, that observation was not necessary to the holding of *Nacarino*; the Court was merely supporting its broader point that the statements about protein quantity were not misleading in and of themselves. But accepting that analysis here, Flatout's protein statements would not be misleading within the meaning of the FDA's regulations. Indeed, at least one district court has relied on *Nacarino* to reject a similar theory. *Roffman*, 2022 WL 4021714, at *7.

But that part of *Nacarino* was (with apologies) wrong. The better reading of the FDA's regulations is that prominently advertising a product's protein quantity outside of the nutrition facts panel *is* misleading (within the meaning of the Food, Drug, and Cosmetic Act and the

FDA's regulations), if the manufacturer doesn't include the quality-adjusted percent in the nutrition facts panel. As a matter of common sense, it's reasonable to think that small text in the nutrition facts panel is less likely to mislead a consumer than text advertising the protein content on the front of a label. When a manufacturer chooses to emphasize a product's protein content elsewhere on a label, the manufacturer is implicitly suggesting that the product is a good source of protein. In effect, it's encouraging consumers to buy the product based off that feature. That's not the case when the manufacturer includes the amount of protein in the nutrition facts panel (something manufacturers must do on all products). *See* 21 U.S.C. § 343(q)(1)(D). Thus, the FDA's regulations are best understood as reflecting a determination that when a manufacturer emphasizes a product's protein content, that statement is misleading without including information about the product's protein quality on the nutrition facts panel.

Taking a step back for a moment, it might seem puzzling that the FDA has not required manufacturers to include the quality-adjusted percent on all products, regardless of whether the label advertises the product's protein content. It seems that the FDA decided not to impose that requirement because it is expensive to calculate a product's precise amino acid score (or, it was expensive at the time the regulations were adopted), and that score is needed to calculate the quality-adjusted percent. *See* 58 Fed. Reg. 2079-01, 2104 (Jan. 6, 1993) (acknowledging comments from manufacturers stating that calculating the amino acid score is "unnecessarily burdensome and expensive, because it requires that digestibility and amino acid analysis be performed on every product"); *id.* at 2103 (describing the percent requirement as a "burden to manufacturers"). Ultimately, the FDA determined that the "additional costs" associated with calculating a product's amino acid score were not justified for all products because Americans generally consume enough high-quality protein in their diets. *Id.* at 2102. But, where a manufacturer decides to make a protein claim, the "the burden and expense" of calculating the percent are "voluntarily assumed by the manufacturer." *Id.* at 2104. The FDA's decision to spare most manufacturers from the expense of calculating the quality-adjusted percent does not mean that protein statements (made outside of the nutrition facts panel) can never be misleading.

Flatout's only response is that the quality-adjusted percent is essentially meaningless, so it does nothing to remedy the potentially misleading statement of protein quantity. They say "reasonable consumers" do not possess "the regulatory or mathematical skill" required to use the percent daily value to convert the "grams of protein stated on the label into digestible protein." Dkt. No. 32 at 4. That misses the point. It might be true that reasonable consumers aren't looking at a food with, say, 20% of the daily value of protein and thinking, "Well, the FDA recommends 50 grams of protein a day, so this product must have 10 grams of digestible protein." But that doesn't seem to be what the FDA is contemplating. The FDA is generally skeptical that consumers know exactly how much of any nutrient they should be consuming every day. *See, e.g.*, 56 Fed. Reg. 60421-01, 60426 (Nov. 27, 1991). That's why the FDA thinks the percent daily value is helpful: it gives consumers a sense of how the food might fit into their broader nutritional needs. So, a consumer might see "20% of the daily value of protein" and think, "I'd have to eat roughly five of these to get enough protein for the day." That doesn't require any complicated math, and that information puts the potentially misleading protein statement in context. The expectations created by statements like "excellent source of protein!" or "20g protein!" can be tempered by looking at the percent daily value.

This conclusion is further supported by the statute authorizing the FDA to promulgate these regulations. The FDA cannot adopt any regulation it wants; it must draw from a source of statutory authority. The parties assert that the FDA could have drawn from one of two sources here: either section 343(q) or section 343(a) of the Food, Drug, and Cosmetic Act. Recall that section (q) requires manufacturers to include certain nutrition information on all their products. 21 U.S.C. § 343(q)(1). Section (q)(1), in particular, requires manufacturers to state the "total protein contained in each serving" on their labels. § 343(q)(1)(D). The FDA has the authority to implement that requirement. § 343(q)(2); 21 U.S.C. § 371. But the regulation at issue in this case does not seem to implement that requirement. Section (q) and its implementing regulations involve nutrients that must be declared on *all* products. Here, the FDA has only required manufacturers to include the quality-adjusted percent in certain circumstances: when the

manufacturer makes a protein claim elsewhere on the product's label. Furthermore, under (q)(1), manufacturers are only required to state the "total protein contained in each serving," not the percent daily value. 21 U.S.C. § 343(q)(1)(D). So section (q) does not seem to be the source of statutory authority for this regulation.

Instead, it seems that the FDA has imposed this requirement under its authority to regulate misleading labels, found in section 343(a). The FDA has historically drawn on that authority when establishing similar requirements. The FDA developed its first iteration of the nutrition facts panel in 1973, before the Nutrition Labeling and Education Act made such disclosures mandatory for all products. *See* 55 Fed. Reg. 29487-01, 29491 (July 19, 1990). Back then, manufacturers were only required to include a nutrition label in certain circumstances, including when "advertising for the food" included a statement "about the food's nutritional properties, its fat or caloric content, or its usefulness in the daily diet." *Id.* In those circumstances, the FDA determined nutrition labeling was necessary "to ensure that the labeling of the food would not be misleading because [the label] failed to reveal facts that were material in light of the representations that were being made." *Id.* The FDA worried that, without additional information, the label's statements "would be confusing and misleading for lack of completeness, and could deceive consumers about the nutritional value of the food, its overall nutritional contribution to the daily diet, and its nutritional weaknesses as well as strengths." *Id.* Based on its statutory authority to regulate false and misleading labels, the FDA required manufacturers to include more information about the food's nutrition content in those circumstances. *See id.* (explaining statutory authority for these requirements).

Today, as in 1973, the FDA has the statutory authority to regulate false and misleading labels. And the current version of the FDA's regulations seem to draw on that power. *See* 58 Fed. Reg. 2302-01, 2303 (Jan. 6, 1993) (explaining the statutory authority for regulations of nutrient content claims). That is to say, the FDA has determined that when a manufacturer makes a protein claim, the manufacturer must include additional information about the protein's quality or else the labeling is misleading. If the FDA had not made that determination, it's unclear what

authority it would have to require manufacturers to include the quality-adjusted percent.

Assuming the FDA adopted this requirement based on its statutory authority to regulate misleading statements, it's not much of a leap to say that failure to follow the requirement renders a label misleading within the meaning of the FDA's regulations. So, contrary to the dicta in *Nacarino*, Rausch has plausibly alleged that a statement of protein quantity outside of a nutrition facts panel is misleading within the meaning of 21 C.F.R. § 101.13(i)(3) if the statement is unaccompanied by the quality-adjusted percent daily value.

## C

Based on that understanding, the claims based on Rausch's final theory—that the labels are misleading within the meaning of various California statutes and California common law— can move forward. The Food, Drug, and Cosmetic Act, as amended by the Nutrition Labeling and Education Act, expressly preempts all state law claims that impose labeling requirements that are "not identical to" the requirements imposed by federal law. 21 U.S.C. § 343-1(a); *see Hawkins v. Kroger Co.*, 906 F.3d 763, 769–70 (9th Cir. 2018). But it does not preempt state law causes of action that are identical to the federal labeling requirements. *Id.* Rausch has plausibly alleged that Flatout's labels fail to comply with the FDA's regulations, and so she can bring state law claims based on that noncompliance. *Effinger v. Ancient Organics LLC*, No. 22-CV-03596-RS, 2023 WL 2214168, at *3–4 (N.D. Cal. Feb. 24, 2023).

## III

Flatout's remaining arguments are easier to address. Based on the allegations in the complaint, Rausch has standing to seek injunctive relief. *Brown*, 2022 WL 1471454, at *10–11. She has plausibly alleged that she has no adequate remedy at law, so she may seek equitable relief at this stage in the litigation. *See Elgindy v. AGA Service Co.*, No. 20-CV-06304-JST, 2021 WL 1176535, at *15 (N.D. Cal. Mar. 29, 2021) (explaining that a plaintiff may allege that they lack an adequate remedy at law when their legal claims "require proof of conduct beyond that which must be shown to establish liability" for their equitable claims). She also has standing to challenge the products she did not purchase because they are "substantially similar" to the

products she did purchase. *See Swartz, et al., v. Dave's Killer Bread, Inc. and Flower Foods, Inc.*, No. 4:21-cv-10053-YGR, at *6–8 (N.D. Cal. Jan. 9, 2023). It's plausible that Flatout's labels could deceive a reasonable consumer. *See Nacarino*, 584 F. Supp. 3d at 809; 58 Fed. Reg. at 2101 (noting that "information on protein quantity alone can be misleading on foods that are of low protein quality"). And without clear guidance from California courts, this Court finds that the economic loss rule does not bar Rausch's claims. *Clenney v. FCA US LLC*, No. 22-CV-00547-VC, 2022 WL 2197074, at *4 (N.D. Cal. June 20, 2022); *Anderson v. Apple Inc.*, 500 F. Supp. 3d 993, 1019–1022 (N.D. Cal. 2020).

But Rausch's conclusory allegation that Flatout's conduct was "willful and malicious" does not support a claim for punitive damages, and so those claims are dismissed. *See Robinson v. J.M. Smucker Co.*, No. 18-CV-04654-HSG, 2019 WL 2029069, at *7 (N.D. Cal. May 8, 2019).

Dismissal is with leave to amend. Any amended complaint is due within 14 days of this order. But in addition, if discovery reveals information relevant to punitive damages, Rausch may seek leave to amend at that point.

**IT IS SO ORDERED.**

Dated: March 8, 2023

VINCE CHHABRIA
United States District Judge